**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2140
_____

JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; JANE DOE 1,

v.

UNITED STATES OF AMERICA,
                                        Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:20-cv-01947)
District Judge: Honorable Jan E. DuBois
_____

Argued: March 22, 2022

Before: BIBAS, MATEY, and PHIPPS, *Circuit Judges*

(Filed: June 13, 2022)
_____

Bradley Hinshelwood                    [ARGUED]
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530
*Counsel for Appellant*

Jonathan D. Lindenfeld                      [ARGUED]
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10016

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., Suite 2400
Chicago, IL 60606
*Counsel for Appellees*

————————————

## OPINION OF THE COURT

————————————

BIBAS, *Circuit Judge*.

Judges cannot right every wrong nor heal every wound. Even if the government hurts someone, the victim cannot sue it for damages without the government's consent. Sovereign immunity may seem harsh. But it ensures that the federal government as sovereign waives immunity not through its judges, but rather through elected officials who are empowered to spend citizens' tax dollars. To safeguard that division of authority, we do not find that Congress waived federal sovereign immunity unless it has spoken clearly.

FBI employees say that Congress did that, letting them sue for money they lost when the government made late payments to their retirement accounts. Not so. Because the statute does not clearly waive the federal government's immunity for the employees' claims, we may not hear them.

2

# I. BACKGROUND

When Congress does not pass a budget in time, the federal government shuts down. Smithsonian museums close, trash cans in national parks overflow, and lots of federal workers do not get their paychecks.

All those things happened at the end of 2018, when the longest shutdown in history began. For more than a month, FBI employees, like other federal workers, were not paid. Nor did they get payments into their Thrift Savings Plan retirement accounts.

Once the government reopened, the employees had a right to back pay. Sure enough, the FBI sent them their missed paychecks and contributed to their Thrift accounts. But the contributions did not make the employees whole. While the government was shut down, the market had risen; "the most popular [Thrift] funds increased over 10%." JA 40 ¶ 10. If the government had made its Thrift contributions on time, that money would have bought more shares than the late payments did.

So the employees filed this class-action suit under the Federal Employees' Retirement System Act of 1986 (FERSA or the Act), which created their Thrift retirement plans. 5 U.S.C. §§ 8401–80. They seek compensation for the investment gains that they would have gotten if the government had made its contributions on time.

To understand their argument, we must dive into the Act. It requires a federal agency to contribute an amount equal to one percent of an employee's salary to his retirement account.

5 U.S.C. §8432(c)(1)(A). Plus, the employee may choose to contribute more of his salary; if he does, the agency must match part of that contribution. §8432(a), (c)(2).

Important here, the Act orders agencies to make their contributions "no later than 12 days after the end of the pay period." §8432(c)(1)(A); *accord* §8432(c)(2)(A). But the FBI did not make those payments for nearly a month.

Those provisions, the employees argue, give them an enforceable right to timely Thrift contributions. Plus, they say they can recover their losses by suing the government in federal court. In support, they point out that the Act lets "any participant or beneficiary" of a Thrift plan sue in federal court "to recover benefits." 5 U.S.C. §8477(e)(3)(C)(i). That provision, they contend, waives the government's sovereign immunity for their claims, since this is a suit to "recover [the] benefit[]" of timely Thrift contributions. *Id.*

The government agrees that §8477(e)(3)(C)(i) waives sovereign immunity but disagrees about the scope of that waiver. It moved to dismiss, arguing that this suit falls outside the waiver. It frames this case as an effort to recover consequential damages from the government's late payment, arguing that such damages are not a "benefit" within the waiver.

The District Court agreed with the employees and refused to dismiss. But it certified this issue for interlocutory appeal, which we have jurisdiction to hear under 28 U.S.C. §1292(b). We review the District Court's reading of the statute de novo. *United States v. Hodge*, 948 F.3d 160, 162 (3d Cir. 2020).

4

## II. SOVEREIGN IMMUNITY BARS THE EMPLOYEES' CLAIMS

To unlock the courthouse door and sue the federal government, a plaintiff needs two keys. He must have a cause of action so he can "invoke the power of the courts" to remedy his injury. *Davis v. Passman*, 442 U.S. 228, 239 (1979). And Congress must have waived sovereign immunity for the specific remedy he seeks. *Lane v. Pena*, 518 U.S. 187, 197 (1996); *see, e.g.*, *FAA v. Cooper*, 566 U.S. 284, 299 (2012) (finding that waiver for "actual damages" did not allow recovery for emotional harm).

Here, everyone agrees that § 8477 both provides a cause of action and waives immunity for suits to "recover benefits" under the Thrift Savings Plan. The only issue is whether the employees' suit seeks to "recover benefits."

It does not. The Act's text and structure show that lost earnings on late Thrift contributions are not benefits. And even if the waiver were ambiguous, we would read it narrowly, in favor of the government.

### A. The text's plain meaning supports the government

Start with the Act. Three provisions are on point. The first requires the agency to make automatic Thrift contributions within twelve days:

> At the time prescribed by the Executive Director, but no later than 12 days after the end of the pay period …, the employing agency shall contribute to the Thrift Savings Fund for the benefit of [the] employee….

5

5 U.S.C. §8432(c)(1)(A). A second provision requires the agency to make matching contributions within twelve days:

> [T]he employing agency … shall make a [matching] contribution to the Thrift Savings Fund for the benefit of [the] employee.… The employing agency's contribution shall be made … no later than 12 days after the end of each such pay period.

§8432(c)(2)(A). And a third provision lets employees sue to "recover benefits":

> A civil action may be brought in the district courts of the United States … (C) by any participant or beneficiary … (i) to recover benefits of such participant or beneficiary under the provisions of subchapter III of this chapter, to enforce any right of such participant or beneficiary under such provisions, or to clarify any such right to future benefits under such provisions.

§8477(e)(3).

Take §8477(e)(3) first. This is a suit brought by plan "participant[s]." And because the right to Thrift contributions falls within "subchapter III," the employees are suing "under [its] provisions." Thus, the only issue is whether this is a suit to "recover benefits." It is not.

A "benefit" is "[t]hat which a person is entitled to in the way of pecuniary assistance." *Benefit* (def. 4d), *Oxford English Dictionary* (2d ed. 1989). In employment, it typically includes

perks like life and health insurance, paid vacation days, and pensions. *See, e.g.*, 29 U.S.C. § 2611(5). Thus, here it most naturally refers only to the agency's Thrift contribution, not damages flowing from a late contribution.

The employees ask us to include the value of *timely* contributions as well. But that reading does not square with the text. Both § 8432(c)(1)(A) and (c)(2)(A) use the word "benefit" to refer to the agency's *contribution*, not its timeliness. The former paragraph phrases the timing requirement as a limit on the Executive Director's power to set the payment time, not as a benefit. § 8432(c)(1)(A). And the latter paragraph lists the contribution requirement in the first sentence and the twelve-day timing requirement after it in a separate sentence. § 8432(c)(2)(A).

In other words, the concrete benefit due is a percentage of salary, not the returns on that money. The verb phrase obligating the agency is "shall contribute" or "shall … ma[k]e." § 8432(c)(1)(A), (c)(2)(A). The direct object of that verb phrase, the thing to be contributed, is the "contribution," defined as a specified percentage of the employee's salary. § 8432(c)(2); *accord* § 8432(c)(1)(A). That is how much the agency must pay "for the benefit of [the] employee." § 8432(c)(1)(A), (c)(2)(A). The twelve-day timing requirement is not the object of the verb phrase. Rather, it is a phrase or sentence that functions like an adverb, specifying not *what* the agency must contribute but *when*.

Plus, under § 8477(e)(3), the "benefit[ ]" must be the thing that the suit "recover[s]." Put another way, the market growth on Thrift funds would have to be a statutory "benefit." But that

7

would mean that if the market falls, the employee would be entitled to a *smaller* late payment than if it had been paid on time. So in a bear market, the government could save money by delaying its contributions. That cannot be right.

The twelve-day limit still means something. It sets an enforceable deadline for contributing. If the agency delays beyond that, employees may sue after that to force it to contribute.

### B. The statutory scheme also favors the government

Confirming our reading of the text, the Act's meaning "becomes even more apparent when viewed in the broader statutory context." *Babcock v. Kijakazi*, 142 S. Ct. 641, 645 (2022) (internal quotation marks omitted). Congress authorized a remedial scheme to let employees recover *some* lost earnings on Thrift contributions, so long as those are "lost earnings resulting from [agency] errors (including errors of omission)." 5 U.S.C. §8432a(a)(1). A regulation implementing that section excludes "an act or omission caused by events that are beyond the control of the [Thrift Investment] Board, the [Thrift] Record Keeper, or the participant's employing agency." 5 C.F.R. §1605.1(b)(iii). The government shutdown stemmed not from an agency error, but from events "beyond the [agencies'] control." *Id.* Congress chose not to authorize remedies for Thrift lost earnings due to those events. We must respect that choice.

### C. We construe waivers of sovereign immunity narrowly

The text, structure, and context suffice to resolve this case. But if any ambiguity remained, we would resolve it for the

government. To waive sovereign immunity, a statute must say so "clearly." *FAA v. Cooper*, 566 U.S. at 291. "[I]f there is a plausible interpretation of the statute that would not authorize money damages against the Government," we should read the statute in "favor of immunity." *Id.* at 290–91. That clear-statement rule guards against unintentional waivers. And it ensures that elected officials, not judges, choose when to open the public purse.

The employees reply that § 8477(e)(3) *does* clearly waive immunity. Any ambiguity is limited to the provisions conferring the benefits and whether they create a right to timely contributions. So they ask us to apply not the clear-statement rule but a "demonstrably lower" standard, borrowed from the Tucker Act. *United States v. White Mt. Apache Tribe*, 537 U.S. 465, 472 (2003). Under the Tucker Act, we ask only whether a statute "can fairly be interpreted as mandating compensation … for the damage sustained." *Id.* (internal quotation marks omitted).

But that Tucker Act case law does not apply here. When a statute has its own remedies, plaintiffs "cannot rely on [the Tucker Act's] fair[-]interpretation test, and instead must stick to the money[-]mandating statute's *own* text." *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1330 (2020) (internal quotation marks omitted); *accord United States v. Bormes*, 568 U.S. 6, 11–16 (2012). Here, the Act authorizes its own remedy by creating a cause of action in § 8477(e)(3); the only question is its scope. And as we have explained, the Act's text, its structure, and the clear-statement rule all bar suits for lost earnings here.

* * * * *

    The government's late retirement payments meant that its employees missed out when the markets rose. But because Congress has not waived the government's immunity from suit for these losses, the employees may not sue to recover their lost profits. So we will reverse and remand the District Court's order.