# United States Court of Appeals for the Federal Circuit

_____

**SANFORD HEALTH PLAN, MONTANA HEALTH CO-OP,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

_____

2019-1290, 2019-1302

_____

Appeals from the United States Court of Federal Claims in Nos. 1:18-cv-00136-EDK, 1:18-cv-00143-EDK, Judge Elaine Kaplan.

_____

Decided: August 14, 2020

_____

DANIEL WILLIAM WOLFF, Crowell & Moring, LLP, Washington, DC, argued for plaintiffs-appellees. Also represented by STEPHEN JOHN MCBRADY, SKYE MATHIESON, CHARLES BAEK.

ALISA BETH KLEIN, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by MARK B. STERN, ETHAN P. DAVIS.

LAWRENCE SHER, Reed Smith LLP, Washington, DC, for amici curiae Blue Cross Blue Shield of North Dakota, Blue Cross and Blue Shield of Vermont, Local Initiative Health Authority for L.A. County, Molina Healthcare of California, Inc.  Also represented by COLIN E. WRABLEY, Pittsburgh, PA.

STEPHEN A. SWEDLOW, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL, for amicus curiae Common Ground Healthcare Cooperative.

_____

Before DYK, BRYSON, and TARANTO, *Circuit Judges*.

TARANTO, *Circuit Judge*.

In the Patient Protection and Affordable Care Act (the ACA), Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended, Congress directed each State to establish an online exchange through which insurers may sell health plans if the plans meet certain requirements.  One such requirement is that insurers must agree to reduce the "cost-sharing" burdens—such as the burdens of making co-payments and meeting deductibles—of certain of their customers.  When insurers meet that requirement, the ACA says, the Secretary of Health and Human Services (HHS) shall reimburse them for the required cost-sharing reductions they have provided to their customers.  42 U.S.C. § 18071(c)(3)(A) ("the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions").  This reimbursement seeks to make the insurers whole for the increased payments they make to healthcare providers when customers do not pay the providers unreduced cost-sharing amounts.

In October 2017, the Secretary stopped making reimbursement payments, due to determinations that such payments were not within the congressional appropriation that the Secretary had, until then, been invoking to pay the

reimbursements.  In January 2018, Sanford Health Plan—a seller of insurance through the North Dakota, South Dakota, and Iowa exchanges—and Montana Health CO-OP—a seller of insurance through the Montana and Idaho exchanges—brought materially identically actions against the United States in the Court of Federal Claims.  The two plaintiffs alleged that they were entitled to damages because the government had violated its statutory obligation—or, in the alternative, breached an implied-in-fact contract—by failing to reimburse them for the cost-sharing reductions they made during the final months of 2017.

The trial court granted summary judgment for the plaintiffs.  *Sanford Health Plan v. United States*, 139 Fed. Cl. 701 (2018); *Montana Health CO-OP v. United States*, 139 Fed. Cl. 213 (2018).  In materially identical opinions, the court concluded that the ACA provision on reimbursement of cost-sharing reductions is "money-mandating" and that the government is liable for money damages for its failure to make reimbursements for the 2017 reductions.  *Sanford*, 139 Fed. Cl. at 702, 706–09; *Montana*, 139 Fed. Cl. at  214, 218–21.  The court did not reach the contract claim in either case.  *Sanford*, 139 Fed. Cl. at 704 n.4; *Montana*, 139 Fed. Cl. at 216 n.4.  Based on stipulations as to the amounts due, the court ultimately entered final judgments of $360,254.00 for Sanford and $1,234.058.79 for Montana.

The government appeals.  We consolidated the appeals, and we now affirm.  After initial briefing and argument, the Supreme Court decided *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020), addressing a different payment-obligation provision of the ACA.  We conclude that *Maine Community* makes clear that the cost-sharing-reduction reimbursement provision imposes an unambiguous obligation on the government to pay money and that the obligation is enforceable through a damages action in the Court of Federal Claims under the Tucker Act,

28 U.S.C. § 1491(a)(1). We see no persuasive basis for distinguishing these cases from *Maine Community*.

## I

Under the ACA, each State was to "establish an American Health Benefit Exchange." 42 U.S.C. § 18031(b)(1).[1] Exchanges are "virtual health-insurance markets," *Maine*, 140 S. Ct. at 1315, that are designed to "facilitate[] the purchase of qualified health plans," 42 U.S.C. § 18031(b)(1)(A). A "qualified health plan" must provide certain "essential health benefits" and, based on the "full actuarial value of the benefits provided under the plan," is designated as providing one of four "levels of coverage": bronze, silver, gold, or platinum, which differ in the percent of the plan benefits that the insurer pays. *Id.*, § 18022(a), (d). A silver plan "is designed to provide benefits that are actuarially equivalent to 70 percent of the full actuarial value of the benefits provided under the plan," leaving 30% for the enrollee (or someone else) to pay. *Id.*, § 18022(d)(1)(B). To sell plans on an exchange, an insurer must "offer at least one qualified health plan in the silver level and at least one plan in the gold level." *Id.*, § 18021(a)(1)(C)(ii).

In addition to providing for the basic exchange infrastructure, the ACA, as relevant here, includes two mechanisms to help certain enrollees in exchange-offered insurance plans bear the cost of obtaining healthcare through such plans. One is directly at issue, the other asserted by the government to be indirectly relevant. We describe them in turn.

---

[1]    In referring to the ACA, we include the amendment adopted almost immediately after enactment. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010). We have been pointed to no later changes in the ACA that alter the analysis.

A

The mechanism directly at issue involves reductions in "cost-sharing"—the contributions to healthcare providers' charges that enrollees must make by way of "deductibles, coinsurance, copayments, or similar charges" or "any other expenditure required of an insured individual" for defined medical expenses. 42 U.S.C. § 18022(c)(3)(A). Specifically, section 1402 of the ACA, which is codified at 42 U.S.C. § 18071, states that the Secretary of HHS "shall" notify an insurer offering a plan on an exchange if an "eligible insured" is "enrolled in a qualified health plan" and, for such an enrollment, that the insurer "shall reduce the cost-sharing under the plan" as specified in subsection (c). *Id.*, § 18071(a)(2). An "eligible insured" must be enrolled in a silver-level plan. *Id.*, § 18071(b)(1). The "eligible insured" must also be an individual "whose household income exceeds 100 percent but does not exceed 400 percent of the poverty line." *Id.*, § 18071(b). The amount of the required cost-sharing reduction varies based on relevant family income. *Id.*, § 18071(c)(1)(A); *see also id.*, § 18071(c)(2) (additional cost-sharing reductions for lower income enrollees).

Of critical importance for purposes of the present appeals, the ACA guarantees reimbursement to insurers of the mandated cost-sharing reductions so that the mandate's burden falls on the federal government, not the insurers that otherwise would pay healthcare providers amounts not paid to them by enrollees when cost sharing is reduced:

> An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary [of HHS] of such reductions and the Secretary *shall make periodic and timely payments to the issuer equal to the value of the reductions.*

*Id.*, § 18071(c)(3)(A) (emphasis added). The ACA reinforces that payment commitment by providing for the government to make advance payments of amounts due. *See id.*,

§ 18082(c)(3) (directing the Secretary of the Treasury, upon receiving notice from the Secretary of HHS "if an advance payment of the cost-sharing reductions . . . is to be made to the [insurer]," to "make such advance payment at such time and in such amount as the Secretary [of HHS] specifies in the notice").

As confirmed by the regulations adopted by the Secretary of HHS, advance payments are merely provisional transfers, with the government's payment obligation ultimately fixed by looking back to what cost-sharing reductions a relevant insurer has actually provided to an eligible insured (with accompanying increased payments the insurer made to healthcare providers). *See* 45 C.F.R. § 156.430. Thus, "the regulations specify that such insurers 'will receive periodic advance payments based on the advance payment amounts calculated in accordance' with a regulatory formula." *Sanford*, 139 Fed. Cl. at 703 (quoting 45 C.F.R. § 156.430(b)(1)); *Montana*, 139 Fed. Cl. at 215 (same). And "[t]he regulations further provide that HHS will reconcile the amounts paid in advance and the actual cost-sharing reductions made." *Sanford*, 139 Fed. Cl. at 703 n.2; *Montana*, 139 Fed. Cl. at 215 n.2 (same); *see* 45 C.F.R. § 156.430(d) (stating that "HHS will perform periodic reconciliations of any advance payments of cost-sharing reductions provided to" an insurer against "*[t]he actual amount of cost-sharing reductions provided to enrollees and reimbursed to providers*" by the insurer) (emphasis added); *id.*, § 156.430(e) (providing that if "the actual amounts of cost-sharing reductions" described in (d) are "[l]ess than the amount of advance payments provided," the insurer "must repay the difference to HHS"; similarly, if advance payments were too low to reflect actual amounts under (d), "HHS will reimburse [the insurer] for the difference").

Despite the payment command regarding cost-sharing reduction reimbursements, however, the ACA contains no permanent appropriation referring to such payments.

B

In section 1401, the ACA establishes a second mechanism for helping enrollees in exchange-offered plans to bear their costs. This mechanism provides a refundable tax credit to lower the premiums that certain enrollees pay to their insurers, with the federal government subsidizing the premium reductions.

Specifically, under section 1401 of the ACA, which is codified in the Internal Revenue Code, 26 U.S.C. § 36B, each "applicable taxpayer" is entitled to a tax credit of "an amount equal to the premium assistance credit amount of the taxpayer for the taxable year." 26 U.S.C. § 36B(a). Determining who qualifies as an "applicable taxpayer" is straightforward. "The term 'applicable taxpayer' means . . . a taxpayer whose household income for the taxable year equals or exceeds 100 percent but does not exceed 400 percent of an amount equal to the poverty line." *See id.*, § 36B(c)(1)(A). Notably, while the income qualification mirrors the income standard of the "eligible enrollee" definition for the cost-sharing reduction program, the premium tax credit program is available more broadly, because "applicable taxpayer" for the premium tax credit, unlike "eligible enrollee" for the cost-sharing reduction, is not restricted to a purchaser of a silver-level plan.[2]

Determining the "premium assistance credit amount"—*i.e.*, the "sum of the premium assistance

---

[2]    The cost-sharing reduction provision of the ACA adds that allowance of a premium tax credit is a prerequisite to allowance of a cost-sharing reduction: "No cost-sharing reduction shall be allowed under this section with respect to coverage for any month unless the month is a coverage month with respect to which a credit is allowed to the insured (or an applicable taxpayer on behalf of the insured) under [26 U.S.C. § 36B]." 42 U.S.C. § 18071(f)(2).

amounts . . . with respect to all coverage months of the taxpayer occurring during the taxable year," *id.*, § 36B(b)(1)— is more complicated. Calculated on a monthly basis, the "premium assistance amount" is the lesser of (1) the monthly premium for the taxpayer's plan and (2) the "excess" of the monthly premium for the "applicable second lowest cost silver plan with respect to the taxpayer, over . . . an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income." *Id.*, § 36B(b)(2). Congress provided for payment of the premium tax credits directly to insurers, using language similar, though not identical, to the language providing for payment of cost-sharing reduction reimbursements to insurers. *Id.*, § 36B(f); 42 U.S.C. §§ 18081, 18082.

For the refundable tax credits, unlike for the cost-sharing reduction reimbursements, Congress provided for payment through an express permanent appropriation. Specifically, the payment of the tax credits is implemented through 31 U.S.C. § 1324, which provides for the "Refund of internal revenue collections." That provision permanently appropriates "[n]ecessary amounts . . . to the Secretary of the Treasury for refunding internal revenue collections as provided by law," *id.*, § 1324(a), but only for expressly listed refunds: "[d]isbursements may be made from the appropriation made by this section only for . . . refunds due from credit provisions" that are then specifically enumerated, *id.*, § 1324(b)(2). As amended by the ACA, one such enumerated provision is 26 U.S.C. § 36B. 31 U.S.C. § 1324(b)(2). The enumeration does not include the ACA's cost-sharing reduction reimbursement provision.

C

The government argues that the premium tax credit subsidy mechanism, though not directly at issue here, is indirectly relevant to assessing its liability for non-payment of cost-sharing reduction reimbursements. That argument depends on the interaction of the two subsidy

mechanisms in operation.  A district court explained two aspects of that interaction in *California v. Trump*, 267 F. Supp. 3d 1119 (N.D. Cal. 2017).  It explained that, given how the tax credit is defined, the credit for an enrollee in any plan can rise when the premium for the second-lowest-cost silver plan rises, *id.* at 1134, and it also explained that when many States raised silver plan premiums to offset insurers' loss of cost-sharing reduction reimbursements, the result was that many consumers received higher premium tax credits, *id.* at 1133–38.  *See Sanford*, 139 Fed. Cl. at 709 n.7; *Montana*, 139 Fed. Cl. at 220 n.7.  The government builds on those two points here to argue that, because premium tax credits are paid to insurers, the loss insurers suffer from non-reimbursement of cost-sharing reductions will often be reduced or wholly eliminated (or, indeed, more than offset) by premium increases designed to account for the cessation of federal payment of cost-sharing reduction reimbursements.  In the *Sanford* and *Montana* cases, however, the government accepts that there were no such premium increases for the 2017 period at issue.  *See Sanford*, 139 Fed. Cl. at 709 ("Sanford was unable to raise its premiums to make up for the shortfall in 2017, because by the time HHS issued its stop payment order, premiums for that year were set"); *Montana*, 139 Fed. Cl. at 220 (same for Montana).

For these cases, therefore, the government's argument is necessarily a categorical one.  The government argues that the existence of the statutory mechanism for premium tax credits categorically eliminates the availability of a Tucker Act damages action for the nonpayment of cost-sharing reduction reimbursements, even if, for a particular period, there were no premium increases that had the purpose or effect of offsetting an insurer's loss of cost-reduction reimbursements.  In this regard, certain textual interconnections of the two mechanisms are worth noting.

42 U.S.C. § 18071, which provides for cost-sharing reductions and reimbursements, contains several references

to 26 U.S.C. § 36B, the premium tax credit provision. *See* 42 U.S.C. § 18071(f)(2) (quoted in note 2, *supra*) (indicating that allowance of cost-sharing reduction depends on allowance of premium tax credit); *id.*, § 18071(b) (referring to 26 U.S.C. § 36B(c)(1)(B), concerning aliens lawfully present in the United States); *id.*, § 18071(f)(1) ("Any term used in this section which is also used in section 36B of title 26 shall have the meaning given such term by such section."); *id.*, § 18071(f)(3) ("Any determination under this section shall be made on the basis of the taxable year for which the advance determination [concerning certain qualifications for ACA benefits] is made under section 18082 of this title and not the taxable year for which the credit under section 36B of title 26 is allowed."). Moreover, other ACA provisions that provide for various implementation programs, including direct payments to insurers, address both cost-sharing reductions and premium tax credits. *See* 42 U.S.C. §§ 18081, 18082 (codifying ACA sections 1411 and 1412). Among those provisions is 42 U.S.C. § 18082(a)(3), which refers to both forms of subsidy as aimed at reducing "premiums": "the Secretary of the Treasury makes advance payments of such credit or reductions to the issuers of the qualified health plans in order to reduce the premiums payable by individuals eligible for such credit." *Id.*

II

In preparation for the inaugural year of the exchanges, the President requested roughly $4 billion for "carrying out, except as otherwise provided, sections 1402 and 1412 of the Patient Protection and Affordable Care Act." Executive Office of the President, *Appendix, Budget of the U.S. Government, Fiscal Year 2014*, at 448, *available at* https://bit.ly/36YUqGi. Congress declined to provide the requested appropriation for reimbursement to insurers for their cost-sharing reductions. *See* Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5; S. Rep. No. 113-71, at 123 (2013) (stating that the "recommendation does not include a mandatory appropriation, requested

by the administration, for reduced cost sharing assistance for individuals enrolling in qualified health plans purchased through the Health Insurance Marketplace, as provided for in sections 1402 and 1412 of the ACA").

In January 2014, despite the absence of a specific appropriation, the Secretary of the Treasury began making cost-sharing reduction reimbursement payments to insurers. When the House of Representatives brought an action for an injunction to stop those payments, the Secretary of HHS and the Secretary of the Treasury (the Secretaries) explained that they had jointly determined that "the permanent appropriation in 31 U.S.C. § 1324, as amended by the Affordable Care Act, is available to fund all components of the Act's integrated system of subsidies for the purchase of health insurance, including both the premium tax credit and cost-sharing portions of the advance payments required by the Act." *United States House of Representatives v. Burwell*, 185 F. Supp. 3d 165, 174 (D.D.C. 2016) (internal quotations omitted). The district court rejected that position, granted summary judgment for the House, and issued an injunction. *Id.* at 168, 174–89. In its analysis, the court described various statutory differences in the treatment of cost-sharing reductions and tax credits, including in the provision for advance payment to insurers, and concluded that such differences show, contrary to the government's contention, "the lack of congressional intent to fuse Sections 1401 and 1402 together through a 'unified' program." *Id.* at 178. The district court sua sponte stayed its injunction pending appeal, *id.* at 168, 189, and cost-sharing reduction reimbursement payments continued.

In October 2017, the Attorney General informed the Secretaries that it was unlawful to use the permanent appropriation for refundable tax credits to make cost-sharing reduction reimbursement payments. *See Letter from the Attorney General to the Secretary of the Treasury and the Acting Secretary of HHS*, at 1 (Oct. 11, 2017), *available at* https://bit.ly/36Zqzh6. The next day, the Secretary of HHS

announced that cost-sharing reduction reimbursement payments would be "prohibited unless and until a valid appropriation exists." *Memorandum from the Acting Secretary of HHS to the Administrator of CMS, Payments to Issuers for Cost-Sharing Reductions*, at 1 (Oct. 12, 2017), *available at* https://bit.ly/36Zqzh6. With that decision, the *House of Representatives* case was settled and the injunction vacated.

The present actions, filed by Sanford and Montana, followed in January 2018. As these cases come before us, each action involves only unreimbursed cost-sharing reductions for the last quarter of 2017. It is undisputed that, for that period, neither insurer set higher premiums to offset the absence of cost-sharing reduction reimbursement payments. In these respects, the present two cases differ from two other cases decided today, *Community Health Choice, Inc. v. United States*, No. 2019-1633, and *Maine Community Health Options v. United States*, No. 2019-2102, both of which involve periods after 2017 for which it is alleged that the insurers, with the approval of state insurance regulators, did raise premiums to offset the non-payment of cost-sharing reduction reimbursements. The trial court, as noted above, ruled in favor of Sanford and Montana and entered judgments for stipulated amounts for the 2017 period at issue.

The government timely appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

III

On appeal, the government challenges the trial court's determination that the ACA provision commanding payment of cost-sharing reduction reimbursements, 42 U.S.C. § 18071(c)(3), is a money-mandating provision for the violation of which the insurers here may seek money damages under the Tucker Act, 28 U.S.C. § 1491(a)(1). That challenge presents a question of law. *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). We reject the

government's challenge. Having so concluded, we, like the trial court, decline to address the alternative claim for breach of contract.

A

The Supreme Court recently explained the governing law in *Maine Community*, drawing on earlier precedents. As relevant to the statutory claim here, the Tucker Act gives the Court of Federal Claims jurisdiction, and waives the sovereign immunity of the United States, for money claims "against the United States founded [upon] . . . any Act of Congress." 28 U.S.C. § 1491(a)(1); *Maine Community*, 140 S. Ct. at 1327. Because the Tucker Act "does not create 'substantive rights,'" *Maine Community*, 140 S. Ct. at 1327, Tucker Act plaintiffs like Sanford and Montana who sue the United States for damages for a statutory violation must show that the statute invoked is a "so-called money-mandating provision[]," *id.* at 1329, the label used to identify a "statutory claim [that] falls within the Tucker Act's immunity waiver," *id.* at 1328.

The Supreme Court in *Maine Community* explained that its precedents establish a general rule to govern when a statutory provision supports a Tucker Act action. That rule is the "fair interpretation" test. *Id.* "A statute creates a right capable of grounding a claim within the waiver of sovereign immunity if, but only if, it can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* (quotations omitted); *see United States v. Navajo Nation*, 556 U.S. 287, 290 (2009); *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). The Court in *Maine Community* reiterated that "[s]atisfying this rubric is generally both necessary and sufficient to permit a Tucker Act suit for damages

in the Court of Federal Claims." 140 S. Ct. at 1328.[3] The Court added that "if a statutory obligation to pay money is mandatory, then the congressionally conferred right to receive money will typically display an intent to provide a damages remedy for the defaulted amount." *Id.* at 1328 n.12 (quotations omitted).

Having recited the general rule, the Supreme Court further explained: "But there are two exceptions." *Id.* at 1328. "The Tucker Act yields when the obligation-creating statute provides its own detailed remedies"—specifically, "its own judicial remedies." *Maine Community*, 140 S. Ct. at 1328, 1329–30 (citing *United States v. Bormes*, 568 U.S. 6, 12–13, 15–16 (2012)). And it yields as well "when the Administrative Procedure Act, 60 Stat. 237, provides an avenue for relief." *Id.* at 1328 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 900–08 (1988)).

B

The Court applied that framework in *Maine Community* to hold that the government was liable for Tucker Act damages for violating the ACA's section 1342(b), 124 Stat. 211–212 (codified at 42 U.S.C. § 18062(b)(1)). *See* 140 S. Ct. at 1315. In section 1342 of the ACA, Congress stated that the Secretary of HHS "shall" create a Risk Corridors program, under which the Secretary "shall" set certain thresholds used to ensure that both profits and losses would be limited for insurers that chose to offer insurance on the new exchanges for the first three years of the exchanges. *Maine Community*, 140 S. Ct. at 1315–16; 124 Stat. at 211–212. "Plans with profits above a certain threshold would pay the Government, while plans with

---

[3] The Supreme Court had no occasion to discuss separately the "illegal exaction" branch of Tucker Act jurisdiction. *See Boeing Co. v. United States*, No. 2019-2148, at 21 n.6 (Fed. Cir. Aug. 10, 2020).

losses below that threshold would receive payments from the Government." *Maine Community*, 140 S. Ct. at 1316. "Specifically, § 1342 stated that the eligible profitable plans 'shall pay' the Secretary [of HHS], while the Secretary 'shall pay' the eligible unprofitable plans." *Id.*[4]

In each of the three years of the program's existence, the money paid in by insurers turned out to be substantially less than the money the Secretary was required by § 1342(b)(1) to pay out. *Id.* at 1317–18. Based on a sequence of post-ACA statutory provisions that limited use of identified appropriations to make such payments, the Secretary declined to pay out more than was received from the profitable insurers. *Id.* Several insurers that had chosen to offer plans on exchanges and suffered losses qualifying them for receipt of payments sued the United States for the

---

[4]    Specifically, the provision commanding the Secretary to pay specified insurers read:

(1) PAYMENTS OUT.—The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and

(B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

§ 1342(b)(1), 124 Stat. at 211.

unpaid amounts under the Tucker Act. *Id.* at 1318. This court concluded that § 1342 was money-mandating under the Tucker Act but that the obligation to pay out amounts more than insurer payments received had been impliedly repealed or suspended by congressional appropriations provisions. *Moda Health Plan, Inc. v. United States*, 892 F.3d 1311, 1320 n.2 (money-mandating conclusion), 1322–23, 1325 (implied repeal or suspension conclusion) (Fed. Cir.), *rehearing denied*, 908 F.3d 738 (2018). The Supreme Court disagreed with the implied repeal/suspension conclusion and reversed, holding that Tucker Act relief was available to the insurers. *Maine Community*, 140 S. Ct. at 1315, 1319, 1331.[5]

The Court first held that the "shall pay" language, unmodified by any relevant qualifying terms, "imposed a legal duty of the United States that could mature into a legal liability through the insurers' actions—namely, their participating in the healthcare exchanges." *Id.* at 1320. The Court next explained that, in ACA § 1342, Congress did not use the often-used tool of "expressly limit[ing] an obligation to available appropriations or specific dollar amounts." *Id.* at 1322. On that basis the Court held that the obligation that ripened into a liability upon the insurers' actions was "neither contingent on nor limited by the availability of appropriations or other funds," *id.* at 1323, nor, therefore, qualified by the Appropriations Clause of the Constitution, art. I, § 9, cl. 7, or the Anti-Deficiency Act, 31 U.S.C. § 1341. *Maine Community*, 140 S. Ct. at 1321–23. The Court then

---

[5]    Like Sanford and Montana here, the plaintiffs in *Maine Community* sought Tucker Act relief based on asserted implied-in-fact contracts as an alternative to the assertion founded on the statutory payment provision. Having agreed with the plaintiffs on the statutory ground, however, the Supreme Court in *Maine Community* did not reach the contract ground. 140 S. Ct. at 1331 n.15.

held that the obligation undergirding the liability was not repealed by the post-ACA appropriations provisions. *Id.* at 1323–27.

The Court continued by "turn[ing] to a final question: Where does [the insurers'] lawsuit belong, and for what relief?," and in answer to the question, the Court held that the insurers "properly relied on the Tucker Act to sue for damages in the Court of Federal Claims." *Id.* at 1327. The Court concluded that § 1342 could fairly be interpreted as mandating compensation and that "neither exception to the Tucker Act applies." *Id.* at 1328. Accordingly, "[t]he Risk Corridors statute is one of the rare laws permitting a damages suit in the Court of Federal Claims." *Id.* at 1329.

As to the "fair interpretation" general rule, the Court stressed the "shall pay" language of the statute. The Court reiterated that "[s]tatutory "shall pay" language' often reflects congressional intent 'to create both a right and a remedy' under the Tucker Act." *Id.* at 1329 (quoting *Bowen*, 487 U.S. at 906 n.42). For the Risk Corridors statute, "[s]ection 1342's triple mandate—that the HHS Secretary 'shall establish and administer' the program, 'shall provide' for payment according to the statutory formula, and 'shall pay' qualifying insurers—falls comfortably within the class of moneymandating statutes that permit recovery of money damages in the Court of Federal Claims." *Id.* The Court added that "[b]olstering" its conclusion is "§ 1342's focus on compensating insurers for past conduct"; the provision does not "'subsidize future state expenditures'" but instead "uses a backwards-looking formula to compensate insurers for losses incurred in providing healthcare coverage for the prior year." *Id.* (quoting *Bowen*, 487 U.S. at 906 n.42).[6]

---

[6]    The Court stated that its conclusion did "not break new doctrinal ground." *Id.* at 1329 n.13. The Court noted that it and the Federal Circuit both agreed that § 1342 was

As to the two exceptions to Tucker Act applicability, the Court held that neither exception applied. The ACA "did not establish a comparable remedial scheme" that would displace the Tucker Act. *Id.* at 1330. And the Administrative Procedure Act (APA) did not bar Tucker Act relief because the claim by the insurers was quite different from the claim that had been held outside the Tucker Act, and within the APA, in *Bowen. Id.* at 1330–31 ("Petitioners do not ask for prospective, nonmonetary relief to clarify future obligations; they seek specific sums already calculated, past due, and designed to compensate for completed labors.").

C

For the cost-sharing reduction reimbursement provision at issue here, 42 U.S.C. § 18071(c)(3), we see no sufficient basis for reaching a different conclusion from the conclusion the Supreme Court drew for the Risk Corridor provision at issue in *Maine Community*.

1

Section 18071(c)(3) uses "shall make . . . payments" language—"the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions"—that is indistinguishable from the "shall pay" language at issue in *Maine Community* and unmodified by limiting language. The obligation is to pay money based on the insurer's specified actions—"participating in the healthcare exchanges" under the statutorily specified conditions, *Maine Community*, 140 S. Ct. at 1320. That obligation logically "mature[d] into a legal liability through the insurers'

_____

money-mandating. *Id.* The Court also stated that the Federal Circuit "agrees with [the Supreme Court's] analysis broadly, having held that 'shall pay' language 'generally makes a statute money-mandating' under the Tucker Act." *Id.*

actions" (here, carrying out the specified cost-sharing re-
ductions). *Id.*

It makes no difference to this conclusion that Congress
did not specifically appropriate money to make the pay-
ments. The government, having initially argued otherwise
in this case (*see* Appellant's Opening Br. at 23–32), now
agrees that *Maine Community* forecloses a contrary conclu-
sion.    *See* Appellant's Post-*Maine Community* Supple-
mental Br. at 6. And the government has not argued that
there is a congressional repeal or suspension applicable to
section 18071(c)(3).

Section 18071(c)(3) readily comes within the general
rule for a statute-based claim under the Tucker Act: its lan-
guage "can fairly be interpreted as mandating compensa-
tion by the Federal Government for the damage sustained."
*Maine Community*, 140 S. Ct. at 1328 (quotations omitted).
Indeed, its "shall make . . . payments" command, which is
not qualified by limiting language and which follows other
"shall" directives regarding the cost-sharing reduction du-
ties, is materially indistinguishable from the "triple man-
date" of "shall" directives that the Supreme Court held in
*Maine Community* "falls comfortably within the class of
moneymandating statutes that permit recovery of money
damages in the Court of Federal Claims." *Id.* at 1329; *see
id.* at 1328 n.12 (explaining that "if a statutory obligation
to pay money is mandatory, then the congressionally con-
ferred 'right to receive money' will typically display an in-
tent to provide a damages remedy for the defaulted
amount" (citations omitted)); *id.* at 1329 (explaining that
"'[s]tatutory "shall pay" language' often reflects congres-
sional intent 'to create both a right and a remedy' under
the Tucker Act" (quoting *Bowen*, 487 U.S. at 906 n.42)).

Such language may be enough by itself, but the conclu-
sion is "[b]olster[ed]" here, as it was in *Maine Community*,
by the character of the obligation as "compensating insur-
ers for past conduct," *i.e.*, as one looking backward to pay

for expenses already incurred. *Id.* The present lawsuits are for amounts that Sanford and Montana expended in 2017, for which they claim reimbursement. More generally, as explained above, *supra* p. 6, although the statute provides for the government to advance funds to insurers to reflect cost-sharing reductions, those are just provisional transfers; the payment ultimately due under section 18071 is for actual amounts already expended by insurers to carry out the cost-sharing reductions while paying healthcare providers so that enrollees received covered services.

Neither of the "two exceptions" recognized by *Maine Community* applies here. The ACA does not contain "its own detailed remedies"—*i.e.*, "its own judicial remedies," *Maine Community*, 140 S. Ct. at 1328, 1329–30—for violations of section 18071(c)(3). Nor does the APA apply: as in *Maine Community*, the insurers here "do not ask for prospective, nonmonetary relief to clarify future obligations; they seek specific sums already calculated, past due, and designed to compensate for completed labors." *Maine Community*, 140 S. Ct. at 1330–31. Indeed, in the present appeals, the government made no argument for applicability of the APA in its opening brief or in its supplemental brief filed after *Maine Community* was decided.[7]

2

Despite the foregoing straightforward application of the *Maine Community* reasoning to the present cases, the government argues that *Maine Community* calls for a different result. The government's premise is that insurers'

---

[7]    The government's reply brief (at 9–10) refers to the APA only in passing, when arguing that the absence of a permanent appropriation defeats application of the Tucker Act. As we have noted, the government abandoned the appropriations-based argument in this court after the decision in *Maine Community*.

loss of cost-sharing reduction reimbursements could cause the insurers to secure (from state regulators) permission to raise premiums, and that such higher premiums would lead to higher premium tax credits under section 1401 of the ACA, offsetting the loss of the cost-sharing reduction payments. Under the government's theory, this sequence is so self-evident and so reliable that we should understand Congress to have deprived an insurer of the otherwise-available Tucker Act remedy for non-receipt of the statutorily promised cost-sharing reduction reimbursements for a period even when the insurer has not received offsetting premium tax credits for that period. We are not persuaded.

Accepting the government's contention would require a marked departure from the *Maine Community* analysis, which the Court indicated did not break new ground in identifying conditions for availability of Tucker Act relief. The premium tax credit provision does not alter the compelling force of the "shall make . . . payment" language of section 18071(c)(3), which readily creates an obligation that matures into a liability upon the insurer's taking the prescribed action, and which readily satisfies the test that a statute "can fairly be interpreted" as compelling compensation for non-payment. Nor does it make the APA applicable. It also does not bring section 18071(c)(3) within the exception to Tucker Act coverage "when 'a law assertedly imposing monetary liability on the United States contains its own judicial remedies.'" *Maine Community*, 140 S. Ct. at 1329–30 (quoting *Bormes*, 568 U.S. at 12). The premium tax credit provision does not provide "judicial remedies" at all, and it therefore is unlike each of the statutory regimes to which *Maine Community* pointed in identifying this exception.[8] Under the background legal principles set forth

---

[8]    The Court in *Maine Community* pointed to the statutes in *Bormes* and in *Horne v. Department of Agriculture*, 569 U.S. 513 (2013), both of which provided specifically for

in *Maine Community*, section 18071(c)(3) comfortably qualifies as a money-mandating provision for which the Tucker Act supplies a judicial remedy not present in the ACA itself (or elsewhere).

The existence of the premium tax credit mechanism in the ACA is not a persuasive reason to infer a congressional displacement of the Tucker Act remedy. In terms of remedy, the premium tax credit mechanism supplies an alternative way for an insurer to try to obtain money (from the federal government) to offset the loss caused by the government's violation of section 18071(c)(3). The statutory linkages of the cost-sharing reduction and premium tax credit provisions, recounted *supra*, include nothing that makes the latter into the sole means of trying to lessen losses from a violation of the former.

As noted above, section 18082(a)(3) on its face may be understood to indicate that government payments to insurers for cost-sharing reductions can help lower "premiums"—presumably because insurers might otherwise seek higher premiums to enable them to pay healthcare providers the amounts enrollees are not paying due to cost-sharing reductions. If silver plan premiums are increased, government payment of premium tax credits to insurers will then rise. But even if section 18082(a)(3) is understood as implicitly so recognizing, it does not support the government's theory. That understanding suggests, at the most, that the premium tax credit mechanism is an additional means for reducing losses, not that this mechanism for reducing losses displaces the otherwise-clearly-available judicial remedy under the Tucker Act to become the sole "remedy."

---

traditional remedies that included access to court to challenge specific agency decisions. 140 S. Ct. at 1330.

The government's conclusion would mean that the background body of law making the Tucker Act applicable to section 18071(c)(3) is displaced even for situations in which, as in the present two cases, the premium tax credit mechanism does not in fact make up for losses from section 18071(c)(3)'s violation. In such situations, the result would be to leave the insurer without redress, counter to *Maine Community*'s recognition that the Tucker Act remedy gives effect to the principle that "[t]he Government should honor its obligations." 140 S. Ct. at 1331.

Such a result is especially unwarranted because there is a separate body of law that more precisely addresses the problem the government identifies. The premise of the government's argument is that the premium tax credit provision can indeed lead to partial or complete offsetting of losses from non-reimbursement of cost-sharing reductions and that the government should not in effect be charged twice for a section 18071(c)(3) violation, once through raised premium tax credits and again through a damages award under the Tucker Act. But a categorical displacement of the availability of Tucker Act damages actions is not necessary to avoid such overpayment. Damages law deals in a more targeted way with matters such as appropriate accounting for offsets and avoidance of double recoveries, as we conclude today in *Community Health Choice, Inc. v. United States*, No. 2019-1633, and *Maine Community Health Options v. United States*, No. 2019-2102. That body of law accommodates the practical interaction of the two subsidy mechanisms without departing from the established principles governing Tucker Act coverage of payment-mandating provisions as most recently set forth in *Maine Community*.

## IV

For the foregoing reasons, we affirm the judgments of the Court of Federal Claims.

## AFFIRMED