# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 18, 2022       Decided June 20, 2023

No. 21-1251

HEATING, AIR CONDITIONING & REFRIGERATION
DISTRIBUTORS INTERNATIONAL, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S.
REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE
U.S. ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

———

Consolidated with 21-1252, 21-1253

———

On Petitions for Review of a Final Action
of the Environmental Protection Agency

———

*Stephen K. Wirth* and *Wayne J. D'Angelo* argued the causes for Association Petitioners and Petitioner Worthington Industries, Inc. With them on the briefs were *Ethan G. Shenkman* and *Jonathan S. Martel*. *Zachary J. Lee* entered an appearance.

*David M. Williamson* argued the cause and filed the briefs for petitioner Choice Refrigerants.

*Andrew S. Coghlan*, Attorney, U.S. Department of Justice, argued the cause for respondents. On the brief were *Todd Kim*, Assistant Attorney General, and *Eric G. Hostetler*, Attorney.

*Melissa J. Lynch* and *David Doniger* were on the brief for *amicus curiae* Natural Resources Defense Council in support of respondents.

Before: HENDERSON, PILLARD and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* PILLARD.

WALKER, *Circuit Judge*: Fridges, freezers, and air-conditioning are technological marvels, making our lives much more comfortable. But those amenities rely on harmful greenhouse gases called hydrofluorocarbons — HFCs for short.

According to the Environmental Protection Agency, those gases threaten the environment because they "can be hundreds to thousands of times more potent than carbon dioxide." 86 Fed. Reg. 55,123 (Oct. 5, 2021). To reduce their use, Congress enacted the American Innovation and Manufacturing Act. 42 U.S.C. § 7675. The Act directs the EPA to pass a rule phasing them out. *Id.* § 7675(e).

After the EPA passed that rule, two regulated companies and three trade associations sought judicial review. They say

that the agency exceeded its statutory authority in two different ways, and that the Act violates the nondelegation doctrine.

One of the statutory arguments fails, as does the nondelegation challenge. But the remaining argument has merit: The EPA lacked statutory authority to pass two measures regulating the distribution of HFCs. So we vacate those parts of the EPA's rule and remand to the agency.

## I. Background

## A. Congress Tasked the EPA with Reducing HFC Use

The United States has long struggled with the environmental impact of refrigeration technology. Before fridges, freezers, and air conditioners used *hydro*fluorocarbons as coolants, they used *chloro*fluorocarbons. But chlorofluorocarbons deplete the ozone layer. So in 1990 Congress started to phase them out. 42 U.S.C. §§ 7671a, 7671c.

That prompted a shift to HFCs. But Congress's change swapped one environmental hazard for another. HFCs, the EPA says, are harmful greenhouse gases — "hundreds to thousands of times more potent than carbon dioxide." 86 Fed. Reg. at 55,123.

In 2020, Congress intervened again, this time passing the American Innovation and Manufacturing Act to phase out HFCs. 42 U.S.C. § 7675. The Act directs the EPA to "issue a final rule . . . phasing down" HFCs "through an allowance allocation and trading program." *Id.* § 7675(e)(3). The Act provides the outline for how that program will work, leaving the agency to fill in the details.

Here's how it works. The EPA first calculates the baseline levels of HFC production and consumption in the United States. *Id.* § 7675(e)(1)(C). The agency then caps maximum annual HFC production and consumption at a percentage of those baselines — for instance, ninety percent in 2023. *Id.* § 7675(e)(2)(B), (C). Over time, the caps come down, eventually reaching fifteen percent in 2036. *Id.*

To ensure that production and consumption stay under the respective caps, the Act puts in place a system of "allowances." *Id.* § 7675(e)(2)(D). An allowance is like a license; without one, "no person shall . . . produce" or "consume" HFCs. *Id.* § 7675(e)(2)(A).

Allowances are initially distributed to HFC users by the EPA. Once allocated, HFC users can buy and sell allowances from one another to adjust their production or consumption capacity. *Id.* § 7675(g). The total number of allowances in circulation corresponds to the current HFC production or consumption cap.

Late last year, the EPA issued its final Phasedown Rule, implementing the cap-and-trade program. 40 C.F.R. pt. 84. Among other things, the Phasedown Rule calculates the annual production and consumption caps, explains how the agency will distribute allowances, and establishes reporting and auditing requirements for HFC consumers. *Id.*

## B. The Petitioners Make Three Challenges to the Rule

The petitioners challenge three different aspects of the Phasedown Rule.

*First*, Choice Refrigerants, a manufacturer of heating and cooling chemicals, challenges the EPA's authority to regulate HFCs within blends.

An HFC blend is a mix of HFCs and other chemicals. Blends are better than plain-vanilla HFCs for some heating and cooling applications. Choice's flagship product is an HFC blend that it manufactures abroad and imports into the United States.

The EPA says mixing an HFC with another chemical does not exempt the HFC from the cap-and-trade program. So importing blends "requires expenditure of allowances," with the number of "allowances necessary" determined according to the "components of the blend that are regulated HFCs." JA 1112; *see also* 86 Fed. Reg. at 55,133, 55,142. If that's correct, Choice must buy allowances to import its blend, and its production costs will go up.

*Second*, Choice claims that Congress impermissibly delegated legislative power to the EPA by giving it unguided discretion to distribute HFC allowances.

The Act lists six types of HFC users — including "mission-critical military" users — who get preferential access to the pool of allowances. 42 U.S.C. § 7675(e)(4)(B)(iv)(I)(ee). The Act also lets the agency designate other "essential" users who should get allowances. *Id.* § 7675(e)(4)(B)(i)-(ii). But beyond that, Choice argues, the Act lets the EPA decide who should get the remaining allowances. And because the statute gives no additional guidance, Choice says it violates the nondelegation doctrine.

*Third*, three trade associations challenge two HFC-distribution regulations in the EPA's rule. The first regulation

mandates refillable cylinders to transport HFCs, thus banning the disposable cylinders used by the industry today. 40 C.F.R. § 84.5(h). The second regulation establishes a certification and tracking system for HFC distribution. *Id.* § 84.23(a). Under that system, "any person who imports, sells, or distributes" HFCs "must permanently affix a QR code to the [HFC's] container that documents a valid certification identification." *Id.* § 84.23(c)(2).

The trade associations argue that the Act does not give the EPA authority to pass those regulations — nowhere does the Act say anything about QR codes or refillable cylinders. That challenge is joined by Worthington Industries, the only domestic manufacturer of refillable and disposable cylinders.

## II. Analysis

Under the Clean Air Act, this Court may set aside the EPA's Phasedown Rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A); *see id.* §§ 7607(d)(1)(I), 7675(k)(1)(C). We "apply the same standard of review under the Clean Air Act as we do under the Administrative Procedure Act." *Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020) (cleaned up).

Applying that standard, we vacate in part the EPA's Phasedown Rule. Choice's challenges fail: The AIM Act gives the EPA authority to regulate HFCs within blends, and we may not consider Choice's nondelegation argument because Choice failed to exhaust it before the agency. But the trade associations' petition fares better: The EPA does not identify a statutory provision authorizing its QR-code and refillable-cylinder rules. So we vacate those parts of the Phasedown Rule and remand to the agency.

## A. The EPA May Regulate HFCs Within Blends

The EPA has statutory authority to regulate HFCs within blends. That's because an HFC within a blend remains a regulated HFC under the Act.

Start with the EPA's statutory authority. The AIM Act directs the EPA to "phas[e] down the production [and consumption] of regulated substances ... through an allowance allocation and trading program." 42 U.S.C. § 7675(e)(3)(A)-(B). So the EPA has authority to require allowances for any regulated substance. *Id.* § 7675(e)(2)(A).

The Act defines a "regulated substance" to include HFCs "listed" in a statutory table. *Id.* § 7675(b)(11), (c)(1) (table of regulated substances). The HFCs listed in the table are identified by their molecular formulas. *Id.*

Under that definition, an HFC within a blend is still a "regulated substance" because it is chemically identical to an HFC outside of a blend. Both have the same molecular structure. As the EPA put it during notice and comment, "[t]he components [of a blend] are not chemically altered in [the blending] process." JA 1112.

In other words, an HFC in a blend of other chemicals is like a blue M&M in a bag of red M&Ms. The blue one does not stop being blue just because it is tossed in with a bunch of red ones. In the same way, an HFC mixed with other chemicals does not stop being a regulated substance under the Act. *Cf.* 42 U.S.C. § 7675(e)(4)(A)(i) (when a chemical process "consume[s]" an HFC to create some other chemically-distinct product, that product is not covered by the allowance-trading program).

In response, Choice argues that blended HFCs are different enough from unblended HFCs that they are not regulated substances. It says "blended products . . . have distinct physical and chemical properties" and "cannot be readily separated into their component[s] . . . without complex fractionation equipment." Choice Br. 4.

That may be true. But it does not go to whether an HFC within a blend has a different molecular composition than an unblended HFC. And when pressed at argument, Choice repeatedly conceded that HFCs within blends are chemically identical to HFCs outside of a blend.

Finally, Choice notes that under the Act, the EPA may not "designate as a regulated substance a blend of substances that includes a[n] [HFC] for purposes of phasing down production or consumption of regulated substances." 42 U.S.C. § 7675(c)(3)(B)(i). But that provision conditions the Administrator's authority to list new HFCs as "regulated substances" subject to the allowance-trading program. *Id.* § 7675(c)(3)(A). Here, the EPA has not exercised that authority, let alone used it to list a blend as a regulated HFC. It has instead regulated already-listed HFCs *within* a blend. And the Act confirms that the prohibition on listing blends "does not affect the authority of the Administrator to regulate under this Act a regulated substance *within* a blend of substances." *Id.* § 7675(c)(3)(B)(ii) (emphasis added).

## B. Choice Failed to Exhaust Its Nondelegation Challenge

Next, Choice says Congress impermissibly delegated its legislative authority to the EPA. *See* 86 Fed. Reg. at 55,142 (noting EPA's "considerable discretion" in allocating allowances under the AIM Act), 55,203 (final rule allocating

allowances).  But because Choice failed to make its nondelegation argument to the EPA during notice and comment, Choice may not raise that argument now.

Choice sues under § 307 of the Clean Air Act, which "appl[ies] to" the AIM Act.  42 U.S.C. § 7675(k)(1)(C).  That cause of action has an exhaustion requirement: a litigant may raise in court only "an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment."  *Id.* § 7607(d)(7)(B).

Choice concedes that it did not raise its nondelegation argument during notice and comment.  Instead, it says it did not need to exhaust its nondelegation argument because it is an objection to the *statute* and not an "objection to a rule or procedure" subject to exhaustion.  *Id.* § 7607(d)(7)(B).

That argument collapses under scrutiny.  The Clean Air Act's cause of action authorizes only a limited category of suits: "petition[s] for review of *action of the Administrator* [of the EPA]."  *Id.* § 7607(b)(1) (emphasis added).  So litigants using the Clean Air Act's cause of action must bring challenges to agency action, not free-floating challenges to statutes. Statutes are passed by Congress, not the "Administrator [of the EPA]."  *Id.*

Thus, to the extent that Choice's suit is an objection to the AIM Act alone, Choice fails to state a claim under the Clean Air Act.  And to the extent Choice is challenging the Phasedown Rule, the Clean Air Act's exhaustion requirement applies.  42 U.S.C. § 7607(d)(7)(B).  Either way, Choice's nondelegation claim is not properly before us.

That said, Choice's petition is best read as a challenge to the EPA's rule.  In substance, its argument is that the EPA's

rule is unlawful because the statute authorizing it is an unconstitutional delegation of legislative power. Indeed, Choice characterizes its argument that way in its brief. It lists the "ruling[ ] under review" as the "Cap-and-Trade Rule" and it asserts that "[t]his Court has jurisdiction . . . to review EPA's final rule." Choice Br. ii, 1. Because Choice's challenge is to the Phasedown Rule, any objections to that rule had to be made first to the EPA. 42 U.S.C. § 7607(d)(7)(B). Choice did not do that here. So we may not consider its nondelegation claim now.

Requiring litigants to first bring nondelegation challenges to the EPA may seem futile. After all, the agency cannot change Congress's grant of broad discretion.[1] But the Clean Air Act's exhaustion rule has no exception for futile challenges. *Texas Municipal Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996) (per curiam) (no futility exception); *see also Lead Industry Association Inc. v. EPA*, 647 F.2d 1130, 1172-74 (D.C. Cir. 1980) (no exception for constitutional challenges to the rulemaking process).[2]

---

[1] The agency *could*, in the rulemaking process, decide for itself that a statute unconstitutionally delegates too much power, rendering a rule unlawful. *Cf.* U.S. Const., art. II (the executive branch, acting under the President, has a duty to "take Care that the Laws be faithfully executed").

[2] True, some constitutional challenges to agency action may be brought directly in district court — even if a statute requires other run-of-the-mill challenges to be first litigated before the agency. *See Axon Enterprise, Inc. v. Federal Trade Commission*, 143 S. Ct. 890 (2023). But that doesn't excuse Choice from the Clean Air Act's exhaustion requirement here. When litigants *choose* to use a statutory review mechanism like the Clean Air Act's, they must still meet its strictures. So even if Choice could have bypassed the Act's exhaustion requirement by bringing its nondelegation claim directly

**C. The Refillable-Cylinder and QR-Code Rules Lack Statutory Basis**

Finally, the trade associations and Worthington argue that the EPA's refillable-cylinder and QR-code rules lack a statutory basis. We agree. The EPA has not identified a provision of the AIM Act giving it the authority to require refillable cylinders or a QR-code tracking system. 40 C.F.R. §§ 84.5(h), 84.23(a).

To support those regulations, the EPA attempts to rely on two provisions of the AIM Act. It initially points to Section 7675(k)(1)(A), which gives the agency authority to "promulgate . . . such regulations as are necessary to carry out the functions of the [EPA] under [the AIM Act]." The EPA recognizes that (k)(1)(A) is a source of procedural not substantive authority — it lets the agency pass rules to carry out powers granted by other provisions of the statute.

For substantive authority, the EPA relies on Section 7675(e)(2)(B):

> (B) Compliance
>
> > For each year [of the phasedown period], the Administrator shall ensure that the annual quantity of all regulated substances produced or consumed in the United States does not exceed the product obtained by multiplying —

---

in district court (we take no position on whether it could), it did not do that here.

   (i) the production baseline or consumption baseline, as applicable; and

   (ii) the applicable percentage listed on the table contained in subparagraph (C).

Relying on Congress's instruction to "ensure" that HFC production and consumption "do[ ] not exceed" the phasedown cap, the EPA's final rule claimed the "authority to establish complementary measures . . . [to] meet the statutory reduction [target]," 86 Fed. Reg. at 55,172 (citing 42 U.S.C. § 7675(e)(2)(B)).

But the EPA's reading has two major problems: It ignores the role that subsection (e)(2)(B) plays in the statutory scheme and it reads too much into the word "ensure."

To start, subsection (e)(2)(B) is a math equation, not a grant of regulatory power. It tells the agency how to calculate the production and consumption cap for each year of the phasedown. To calculate the cap, the agency must "multiply[ ]" the "production baseline or consumption baseline" by the "applicable percentage listed on the table" in (e)(2)(C). 42 U.S.C. § 7675(e)(2)(B).

Confirming that reading, statutory cross-references treat (e)(2)(B) as a formula setting the cap for each year of the phasedown. For example, subsection (e)(2)(D)(i) instructs the EPA to "determine the quantity of allowances . . . that may be used for the following calendar year" by referring to the cap "calculated under" (e)(2)(B). *Id.* § 7675(e)(2)(D)(i). Similarly, under (e)(5), the EPA may allow an HFC producer to make more HFCs than authorized by his "production allowances" if doing so "would not violate" the cap in (e)(2)(B). *Id.* § 7675(e)(5), (B)(iii).

Given the role that (e)(2)(B) plays in the statutory scheme, that subsection would be an odd place for Congress to locate a grant of sweeping regulatory power letting the agency pass additional measures to phasedown HFCs. True, the placement of statutory language is only one part of the puzzle. Courts must vindicate the plain meaning of the text wherever it is placed in the statute. But here the statutory text does not support the EPA's assertion of power.

Reading subsection (e)(2)(B) to grant the EPA authority to pass complementary measures leans heavily on the word "ensure." The EPA asserts that (e)(2)(B)'s use of "shall ensure" reflects Congress's "intentional effort to confer the flexibility necessary [for] the agency to accomplish the statute's aims" and so gives the EPA "more general authority to establish complementary measures to ensure that the statutory phasedown is achieved." EPA Br. 52 (cleaned up).

We disagree. To "ensure" is "to make sure, certain, or safe." Ensure (def. 1), *Merriam-Webster* (2023). So when Congress told the EPA to "ensure" that the annual HFC consumption cap is not "exceed[ed]," all it said was that the agency should guarantee that result. 42 U.S.C. § (e)(2)(B). Subsection (e)(2)(B) does not tell the agency anything about *how* to "ensure" the cap is met.

The rest of the statute does that job. Congress gave the EPA the power to ensure the cap is met by using the allowance-trading program, *id.* § 7675(e), detailed statutory auditing and reporting requirements, *id.* § 7675(d), and the EPA's power to pass rules regulating "practice[s], process[es], or activit[ies]" for "servicing, repair[ing], dispos[ing of], or install[ing] [HFC] equipment," *id.* § 7675(h)(1).

Those detailed instructions undercut the agency's claim that (e)(2)(B) gives it power to pass other measures. When "draftsmen[] mention . . . one thing, like a grant of authority" it "necessarily, or at least reasonably, impl[ies] the preclusion of alternatives." *Shook v. D.C. Financial Responsibility and Management Assistance Authority*, 132 F.3d 775, 782 (D.C. Cir. 1998). Congress's exhaustive instructions to the agency throughout the AIM Act make it less plausible that Congress meant the words "shall ensure" in (e)(2)(B) to give the EPA broad power to pass new rules.

That intuition becomes even stronger when we consider the breadth of the EPA's claimed power. The refillable-cylinder rule alone is likely to impose between $441 million and $2 billion in costs on the regulated industry. 86 Fed. Reg. at 55,174 ($441 million estimate); JA 119 ($2 billion estimate). It is unlikely that Congress would have granted the agency authority to pass a rule of that magnitude in a provision of the statute that says nothing about complementary measures, refillable cylinders, or QR Codes.

To be clear, we do not decide this case under the major-questions doctrine. That doctrine holds that courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022) (cleaned up). And the EPA's QR-code and refillable-cylinder rules are less important and expensive than other regulations to which the Supreme Court has applied that doctrine. *See id.* at 2609*; NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022).

Instead, we rely on another long-standing rule of interpretation: "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. American Trucking Associations*, 531

U.S. 457, 468 (2001). Whereas the major-questions doctrine has a constitutional basis — safeguarding the "separation of powers" by ensuring that agencies do not use statutory ambiguities to make decisions vested in our elected representatives — the *American Trucking* rule rests on a more modest intuition about how we use language. *West Virginia*, 142 S. Ct. at 2609. The touchstone of statutory interpretation is always to "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (cleaned up). Ordinary readers of English do not expect provisions setting out math equations to empower an agency to prescribe other "fundamental details of a regulatory scheme." *Whitman*, 531 U.S. at 468.

Because the EPA's interpretation of (e)(2)(B) seeks to do just that, it strains against the ordinary use of language. That is an important clue that the EPA advances an implausible reading of the statute.

\* \* \*

The EPA has not identified a statute authorizing its QR-code and refillable-cylinder regulations. We therefore vacate those parts of the Phasedown Rule and remand to the agency.

We deny Choice's challenges to other aspects of the rule.

*So ordered.*

PILLARD, *Circuit Judge*, concurring in part and dissenting in part:

I agree with my colleagues that EPA has the statutory authority to regulate hydrofluorocarbons (HFCs) that are contained within blends. I also agree that we may not hear Choice's nondelegation argument because Choice failed to exhaust it before the agency.

I write separately to explain why EPA has the authority to require refillable cylinders for regulated HFCs and to implement a QR-code tracking system to trace the import, sale, and distribution of HFCs through the supply chain. In the American Innovation and Manufacturing Act, Congress imposed on EPA a duty to "ensure" compliance with the schedule Congress mandated for phasing down HFC production and consumption. 42 U.S.C. § 7675(e)(2)(B). The Act makes clear that Congress intended its phasedown schedule to be met. To that end, it empowered EPA to "promulgate such regulations as are necessary" to effect compliance. *Id.* § 7675(k)(1)(A).

The rule under review falls squarely within EPA's congressionally delegated authority: The agency determined that, to accomplish the HFC phasedown, it was necessary to require refillable cylinders with unique, trackable QR codes, so it promulgated a final rule to that effect. After all, requiring refillable and trackable cylinders is a straightforward way to "ensure" that the regulated substances they contain correspond to allowances the statute requires. Without such tools, it is hard to see how EPA can ensure the phasedown.

My colleagues' conclusion that EPA's duty to ensure compliance is nothing more than a "math equation," Maj. Op. 12, understates and undercuts the responsibility Congress gave the agency. Their reading runs counter to the statute's text and structure. It will hamstring EPA's efforts to combat illicit trade

in HFCs, making it less likely that the United States accomplishes the HFC reductions Congress mandated. And the majority's interpretation will have unfortunate side effects for domestic industry and law enforcement: Even as it places law-abiding U.S. importers and producers at a competitive disadvantage by making the United States market an easy target for illegal HFCs, it will help the illegal product to circulate unseen by U.S. law enforcement.

## I.

HFCs are highly potent greenhouse gases with global warming potentials "that can be hundreds to thousands of times more potent than carbon dioxide." 86 Fed. Reg. 55,116, 55,123/3 (Oct. 5, 2021). "[T]heir use is growing worldwide," in part due to "the increasing use of refrigeration and air conditioning equipment globally." *Id.* The amount of HFCs in the global atmosphere is thus increasing at "accelerating rates." *Id.* "[E]levated concentrations of [greenhouse gases] including HFCs have been warming the planet, leading to changes in the Earth's climate," such as "in the frequency and intensity of heat waves, precipitation, and extreme weather events." *Id.* at 55,124/2.

Recognizing that releases of these potent greenhouse gases are projected to continue accelerating rapidly, the United States joined with more than 140 countries to ratify the so-called Kigali Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer. The signatories to the 2016 Kigali Amendment committed to a "global phasedown of the production and consumption of HFCs." *Id.* at 55,123/3-24/1; *see id.* at 55,139/1-2. If fully implemented, the Kigali

Amendment "is expected to avoid up to 0.5 °C of warming by 2100." *Id.* at 55,124/1.

In keeping with that international commitment to phase down HFCs, Congress enacted the bipartisan American Innovation and Manufacturing (AIM) Act. Pub. L. No. 116-260, div. S, § 103, 134 Stat. 2255, 2255-71 (2020) (codified at 42 U.S.C. § 7675). Under the Act, HFC production and consumption in the United States must be phased down to 15 percent of baseline levels by 2036. 42 U.S.C. § 7675(e)(2). The Act imposes those steep restrictions on HFC supply while other parties to the Kigali Amendment are also limiting the supply of HFCs in "ways that are similar." 86 Fed. Reg. at 55,139/1.

Ensuring compliance with that HFC phasedown will be no small feat. As countries around the world tighten restrictions on HFCs, incentives to trade illegally are surging. In EPA's experience—including during the United States' participation in the global phasedown of ozone-depleting substances and in the early stages of the HFC phasedown elsewhere—declining allowances for lawful import and production of a substance tend to increase its illegal trade. *See id.* at 55,166/2-68/1, 55,166/2 n.63. Indeed, observed rates of noncompliance with HFC quota systems have been dramatic. One study found that even those imports that were reported to European customs officials "exceeded the quota amount by 16 percent in 2019 and 33 percent in 2020." *Id.* at 55,167/1. In another study, 72 percent of surveyed companies in Europe, where disposable cylinders are illegal, "had seen or been offered refrigerants in disposable cylinders." *Id.* at 55,166/3. The United States faces similar pressures. *Id*. at 55,167/2. Without appropriate compliance measures to enable vigorous enforcement, illegal trade will likely swamp the congressionally mandated phasedown. Left unchecked, illicit trade in HFCs threatens to

"significantly harm the environment, the United States economy, and consumer and worker safety." *Id.* at 55,168/1.

In promulgating the phasedown rule mandated by the Act, EPA thus took a "multifaceted approach . . . to deter, identify, and penalize illegal activity." *Id.* EPA adopted sensible compliance measures to ensure the HFC phasedown and "to create a level playing field for the regulated community." *Id.* Two such compliance measures are at issue here: first, a prohibition on single-use cylinders for regulated HFCs and, second, a container-tracking system requiring QR codes to provide visibility into the import, sale, and distribution of HFCs.

## II.

Two provisions of the AIM Act work in tandem to authorize EPA's refillable-cylinder and QR-code regulations. First is subsection 7675(k)(1)(A), which empowers EPA to "promulgate such regulations as are necessary to carry out the functions of the Administrator" under the Act. 42 U.S.C. § 7675(k)(1)(A). The majority explains that "(k)(1)(A) is a source of procedural not substantive authority – it lets the agency pass rules to carry out powers granted by other provisions of the statute." Maj. Op. 11. So far, so good. On this much the majority and I agree: Whenever the Act assigns to EPA a substantive responsibility or function, EPA may also promulgate rules "as necessary" to carry out that function.

The second provision—and source of EPA's substantive responsibility—is subsection 7675(e)(2)(B). Recall that subsection (e)(2)(B), entitled "Compliance," says that EPA "shall ensure" that annual HFC production or consumption "does not exceed" the congressionally mandated cap for any given year. 42 U.S.C. § 7675(e)(2)(B). On the meaning of that provision, the majority and I part ways. To be sure, the

majority starts off on the right foot:  Subsection (e)(2)(B) does set out the production and consumption caps and provide the formula for calculating them.  But, while it includes a formula, subsection (e)(2)(B) is not just a "math equation."  Maj. Op. 12.

In subsection (e)(2)(B), Congress called on EPA to make certain that the HFC phasedown is achieved.  That duty flows from the plain text of the provision.  The operative words are "shall ensure."  "The first sign that the statute impose[s] an obligation is its mandatory language: 'shall.'"  *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020).  "[T]he word 'shall' usually connotes a requirement."  *Id.* (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016)).  The duty subsection (e)(2)(B) places on EPA is to "ensure"—that is, to guarantee—that annual HFC production or consumption "does not exceed" the congressionally mandated cap for any given year.  42 U.S.C. § 7675(e)(2)(B).  In other words, as EPA put it, the agency has "the responsibility to ensure that the statutorily required phasedown occurs."  86 Fed. Reg. at 55,172/3.

Congress supplied another cue as to the intended meaning of subsection (e)(2)(B): its heading.  *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018).  In subsection (e)(2)(B), Congress described EPA's authority as one of "Compliance"—not just "Calculation."  That choice of heading underscores that Congress intended to impose on EPA a duty to guard against non-compliance with the congressionally mandated phasedown.

As the majority recognizes, however, subsection (e)(2)(B) does not spell out in detail *how* the agency is to ensure the cap is met.  Maj. Op. 13.  For that, we return to EPA's procedural authority found in subsection (k)(1)(A).  Because one of the

Administrator's functions under the Act is to "ensure" compliance with the phasedown, 42 U.S.C. § 7675(e)(2)(B), EPA may issue appropriate rules as necessary to do so, *id.* § 7675(k)(1)(A). That is, Congress delegated to EPA the authority to promulgate reasonable compliance measures, so long as they are necessary to guaranteeing that the phasedown is met (and do not conflict with any other provision of the Act).

The final rule under review is a run-of-the-mill exercise of EPA's compliance responsibilities under the Act. EPA concluded that both the refillable-cylinder and QR-code requirements were "necessary" to "ensure" annual HFC production and consumption do not exceed the phasedown limits. *See id.* § 7675(e)(2)(B), (k)(1)(A). As EPA explained, "[a] program to control the production and import of HFCs is only achievable to the extent it can be enforced." 86 Fed. Reg. at 55,175/1. Therefore, "[r]estrictions designed to deter and identify illegal imports . . . are a *necessary* component to such a program." *Id.* (emphasis added).

A refillable-cylinder requirement is necessary because the "visual differences" between disposable and refillable cylinders "allow Customs officials and law enforcement personnel to easily distinguish" between legally permitted refillable cylinders and disposable ones that "are favored for illicit trade." *Id.* at 55,173/1. Indeed, refillable-cylinder requirements have a "proven track record of facilitating detection and interdiction of illegal HFCs." *Id.* Several other jurisdictions, including the European Union, Canada, Australia, and India, have already adopted such requirements.

Similarly, "a comprehensive container tracking system is needed" so as "[t]o help ensure the quantity of regulated substances produced or consumed in the United States does not exceed the Congressionally mandated cap." *Id.* at 55,186/1.

The QR-code tracking system makes it easy to spot HFCs that do not enter the market legally. *Id.* at 55,183/3. Such a system is also "especially important for identifying illegal production [within the United States]—as that material will not have a check at the port like imports." *Id.* at 55,185/3.

Not only were both measures permissibly promulgated under the AIM Act, but they were also well within EPA's expertise. For example, EPA has long regulated the containers and labeling for other substances it regulates, such as pesticides, *see, e.g.*, 40 C.F.R. § 156.3 *et seq.* (labeling requirements); *id.* § 165.1 *et seq.* (container requirements), and underground storage tanks for biofuels, *see id.* § 280.10 *et seq.* And, in running other trading programs, EPA is familiar with the need for systems to track substances subject to statutory quantity controls. *See, e.g., id.* § 80.1425 *et seq.* (requiring renewable identification numbers, or RINs, to account for batches of qualifying renewable fuels). Furthermore, EPA has long partnered with other federal agencies, including U.S. Customs and Border Protection (CBP) and the Department of Justice, to help curb illicit trade in substances that it regulates. Since the 1990s, for instance, EPA has coordinated with CBP and other agencies to ensure the phaseout of ozone-depleting substances—an experience which informed EPA's promulgation of the rule at issue here. *See* 86 Fed. Reg. at 55,167/3.

As the final rule well illustrates, EPA's compliance function is vital to the statutory scheme. Ensuring compliance with a stringent new HFC phasedown is a daunting task, for which agency specialization and adaptability are paramount. Rather than confine EPA to any one tool, Congress left it to agency discretion to determine how best to root out non-compliant trade in HFCs. Given sophisticated efforts to evade HFC phasedowns elsewhere—as well as EPA's own

experience combatting illicit trade in ozone-depleting substances—it made sense for Congress not to specify precise methods, but to charge EPA to adopt compliance measures as necessitated by the circumstances, and to adapt and improve them based on the lessons of experience. *See id.* at 55,166/2-68/1.

The AIM Act is clear and robust on paper. But without the subsection (e)(2)(B) compliance function, it may prove flimsy in practice. As EPA explained, the steep domestic phasedown of HFCs will meet forceful and sophisticated efforts from around the globe to evade the HFC allowance system. *See id*. The court's decision today to read out of the Act the limited but flexible authority to prevent such noncompliance leaves EPA with few and inadequate tools to ensure the HFC phasedown is achieved.

## III.

The majority resists the plain meaning of subsection (e)(2)(B) by characterizing it as only "a formula setting the cap for each year of the phasedown." Maj. Op. 12. That is a cramped reading of the language Congress used in subsection (e)(2)(B).

For one, Congress' use of the word "ensure"—which, as the majority agrees, means to make sure or to "guarantee," Maj. Op. 13—is a perplexing one for a provision that my colleagues say describes only a calculation. If Congress wanted subsection (e)(2)(B) to provide EPA only the limited authority to calculate the production and consumption caps, it could easily have done so. Subsection (e) is littered with instructions for EPA to establish or calculate certain numerical values: Congress instructed that EPA "shall establish" production and consumption baselines for the phase-down of regulated substances, 42 U.S.C. § 7675(e)(1)(A); that each of those

baselines "is the quantity equal to the sum of" certain statutorily enumerated calculations, *id.* § 7675(e)(1)(B), (C); and that, in calculating those baselines, "the Administrator shall use" certain exchange values provided in the statute, *id.* § 7675(e)(1)(D). Put otherwise, Congress knew how to prescribe a mere calculation. It did more than that in subsection (e)(2)(B).

Nor should we read much into the fact that the Act at times gives EPA "detailed instructions" regarding other agency responsibilities. Maj. Op. 14. The *expressio unius* canon on which the majority relies is "an especially feeble helper in the administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990). In the administrative context, "we have consistently recognized that a congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.*, to leave the question to agency discretion.'" *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (quoting *Cheney R.R. Co.*, 902 F.2d at 69).

The majority's reliance on the *expressio unius* canon is doubly irksome, however, because we normally "do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). To read the statute as the majority does, we would have to "be confident that a normal draftsman when he expressed 'the one thing'"—for example, the creation of an allowance-allocation-and-trading program—"would have likely considered the alternatives that are arguably precluded"—that is, refillable-cylinder and QR-code requirements—and by not mentioning them meant to put them

off limits. *Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998). But neither the majority nor the trade associations have provided any reason to think that Congress considered and rejected either a refillable-cylinder requirement or container-tracking system.

Rather, recognizing that it could not foresee every way in which regulated entities might evade the HFC phasedown, Congress in subsection (e)(2)(B) stated EPA's compliance duties in general terms so as "'to confer the flexibility necessary' for [EPA] to address yet unknown threats" to the HFC phasedown. *Corbett v. TSA*, 19 F.4th 478, 488 (D.C. Cir. 2021) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007)). To the extent EPA's compliance authority might be viewed as "broad," Maj. Op. 14, that reflects Congress' deliberate choice to leave specific compliance measures to EPA's discretion. "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

Finally, it bears emphasis that the compliance authority granted and exercised here is not, relatively speaking, particularly broad. My colleagues' conclusion that the authority EPA claims under subsection (e)(2)(B) is somehow disproportionate to the terms in which Congress conferred it, Maj. Op. 13-15, is badly misplaced. The modest regulatory measures EPA promulgated are a far cry from the kinds of sweeping or implausible measures that have triggered extra skepticism from the Supreme Court—whether that scrutiny takes the form the trade associations demand, *see* Association Reply Br. 11-13 (citing *West Virginia v. United States*, 142 S. Ct. 2587 (2022)), or the majority undertakes, *see* Maj. Op. 14-15 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)). For one thing, EPA acted here within the limited

ambit of a recent, pollutant-specific statute to deploy familiar tools to help effectuate a defined phasedown. For another, the ostensible "magnitude" of the compliance costs on industry is overstated. The prohibition on single-use cylinders is projected to cost a mere $22 million annually on average, and the QR-code tracking system would cost even less. 86 Fed. Reg. at 55,174/1; U.S. Env't Prot. Agency, EPA-HQ-OAR-2021-0044-0227-02, Regulatory Impact Analysis for Phasing Down Production and Consumption of Hydrofluorocarbons (HFCs) 69 (2021) (J.A. 720). Those costs would seem to be a mere drop in the bucket for a multi-billion-dollar regulated industry. And they are no reason for enhanced judicial scrutiny in the face of the far greater health and welfare costs likely to flow from circumventing the phasedown. *See* 86 Fed. Reg. at 55,119/1-2 & tbl.1, 55,197 tbl.8 (estimating the rule's annualized net benefits at more than $14 billion).

In any case, the *American Trucking* decision relied on by the majority "stands for the rather unremarkable proposition that sometimes statutory silence, when viewed in context, is best interpreted as limiting agency discretion." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009). But, as we have already seen, the statutory text and context here point in the other direction: Congress assigned to EPA the function of "ensur[ing]" nationwide "[c]ompliance" with the HFC phasedown schedule and empowered the agency to promulgate rules "as are necessary to carry out" that function. 42 U.S.C. § 7675(e)(2)(B), (k)(1)(A). In so doing, Congress left the development of specific compliance measures up to EPA's informed discretion. EPA's entirely unsurprising choice to set up a standardized system for transporting HFCs in refillable cylinders labeled with trackable QR-codes falls comfortably within that discretion.

12

\* \* \*

In short, EPA validly exercised its authority under the AIM Act to ban non-refillable cylinders and adopt a container-tracking system.  Because today's decision understates and undercuts EPA's statutorily imposed authority and duty to ensure compliance with the HFC phasedown, I respectfully dissent from Section II.C of the majority opinion.